# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83472-0-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| MAHAMAD SAYIDIN, | |
| Appellant. | |

ANDRUS, C.J. — Mahamad Sayidin appeals his conviction for first degree robbery arising from an incident in which he attacked and robbed a stranger in a wheelchair. He argues that the trial court violated his constitutional rights to testify and attend trial when it removed him from the courtroom on multiple occasions during the proceedings. We conclude that Sayidin knowingly, intelligently, and voluntarily waived his right to be present and to testify either by affirmatively refusing to attend his trial or by engaging in behavior so disruptive as to prevent his trial from proceeding. We affirm his conviction.

## FACTS

On the evening of April 9, 2016, Ruth Larson took the bus to downtown Seattle to attend a Mariners game at Safeco Field. When Larson, who uses a wheelchair, stopped near the field, Mahamad Sayidin approached her and asked

Citations and pin cites are based on the Westlaw online version of the cited material.

for a cigarette. After Larson gave Sayidin one of her cigarettes, he pulled Larson out of her wheelchair and began to hit her in the face repeatedly and then grabbed her belongings. Sayidin dragged her across the sidewalk and pressed his forearm against her neck before taking off with Larson's backpack. Larson followed Sayidin while yelling for help. After two blocks, Sayidin sat down at a bus stop and began going through Larson's backpack. The police arrived soon after and arrested Sayidin. On April 13, 2016, the State charged Sayidin with first degree robbery of Larson and fourth degree assault of a bystander.[1]

Between 2016 and August 2021, Sayidin went from the King County Jail to Western State Hospital (Western) at least six times. On May 26, 2016, Sayidin's defense counsel requested the first of many competency evaluations and the trial court granted the request. After a court-ordered competency evaluation at Western, the court held a hearing on June 23, 2016 to address the resulting report. Sayidin refused to come to court. The State asked the trial court for a reasonable use of force order (or drag order) to bring Sayidin to court, and defense counsel deferred to the court, stating "[t]his has happened before." The trial court granted the State's request and entered a finding that Sayidin was competent to stand trial.

At a November 14, 2016 hearing on the State's motion to continue trial, defense counsel raised the issue of competency again, arguing that, during the previous months, Sayidin had experienced "a substantial decline in his ability to assist counsel" and "[t]here are also some very concerning behavior[s] in the jail with respect to actions that lead me to believe that . . . a second competency

---

[1] The State moved to dismiss the assault charge during trial.

evaluation is necessary." The trial court stated that its impression was "that the defendant is aware of these proceedings," but agreed to order another competency evaluation to occur in the King County Jail. On December 8, 2016, the parties stipulated to modifying the order to require that the evaluation occur at Western because Sayidin had attempted to harm himself in the jail and the evaluator believed an in-patient evaluation was necessary for Sayidin's health and safety.

On January 30, 2017, the trial court summarized the results of the second evaluation. The evaluator diagnosed Sayidin as suffering from schizophrenia or another psychotic disorder and a substance use disorder, and concluded that "while Mr. Sayidin may have a factual understanding of court proceedings, he really is not able to assist his attorney with a reasonable degree of understanding or competence." Based on this report, the court found Sayidin not competent to stand trial and ordered that he be transported to Western for 90 days of competency restoration.

After returning from Western, Sayidin continued to refuse to speak with defense counsel or allow himself to be interviewed by a defense expert in order for counsel to contest competency. At a September 14, 2017 hearing, counsel reported that Sayidin had decompensated and was refusing to meet with the defense expert. The State contended that the Western evaluator believed that "elements of Mr. Sayidin's presentation . . . appear feigned, there are elements of Mr. Sayidin's presentation that appear rooted in personality disorder traits as opposed to treatable mental illness." The court set a date for a status conference and a competency evidentiary hearing.

- 3 -

At the scheduled status conference on September 22, 2017, Sayidin refused to be transported to court. The State notified the court that it had filed new charges against Sayidin, alleging custodial assault after Sayidin threw feces on a nurse who was giving him medication. The trial court continued the hearing to September 27, 2017 and entered a drag order to force Sayidin's appearance for that hearing.

When he appeared for that hearing, Sayidin immediately interrupted proceedings, repeatedly saying that the individuals present in court were all "f---in' UFOs." The court warned Sayidin that he would be removed if he could not be quiet and Sayidin responded "I don't want to stay here. F--- this place." The court attempted to speak directly with Sayidin to confirm that he wanted to leave the courtroom, but Sayidin continued to use profane epithets and did not respond to the court's question. The court ordered officers to remove Sayidin from the courtroom and ordered that he undergo a third in-patient competency evaluation at Western.

This pattern repeated itself over the next four years, during which time the State filed more custodial assault charges against Sayidin and the trial court ordered several more competency evaluations. The court found Sayidin incompetent to stand trial in April 2018 and November 2018. The court found him competent in October 2018, May 2019, August 2020, and December 2020.

Sayidin refused to appear at many of the competency or pretrial hearings and, when he did appear, either voluntarily or via a drag order, the trial court

frequently had to have him removed for disrupting the proceedings. On some of these occasions, Sayidin expressed his desire to leave the proceedings willingly.

At a May 24, 2019 hearing, for instance, the court explained:

Mr. Sayidin was very agitated this morning. He was making gestures with his hands that required the jail officers to put him in handcuffs. His temper was up. His voice was elevated. The record can speak for itself. He was using profanities in court. And I asked him if he wanted to stay. He was somewhat tangential in his response, but ultimately decided he did not want to be here for the hearing. I'm going to just make a finding that he made a knowing, intelligent, and voluntary waiver of his presence.

At a June 2019 hearing, Sayidin was again disruptive, speaking over the court and refusing to remain quiet when asked to do so. The court warned Sayidin that if he was not quiet, "you might have to watch your trial remotely." Sayidin responded, "I'm keep talking, no problem. No problem at all." The court had to have Sayidin removed because he was talking so loudly that the court could not hear counsel. The court noted for the record that:

Mr. Sayidin came in today in a suicide smock and a spit mask. There were six jail officers. He remained restrained. This was based on my order given information that I had received in advance of this hearing. My conclusion was that Mr. Sayidin presented a security risk to the courtroom and courtroom participants. I discussed this with Sergeant Maude, who is in the courtroom this morning.

Sergeant Maude, an officer with the Department of Adult and Juvenile Detention (DAJD), reported to the court that Sayidin had a history of assaulting jail staff and had been charged with two custodial assaults involving eight victims. The court noted that "virtually every time he's appeared in court, he's been in a suicide smock, he has used foul language. He's always agitated." Sayidin's counsel confirmed that in meeting with his client, "he has always been in a suicide smock. That has been a constant. He's never been out of one." Sayidin exhibited similar

behavior at an August 2020 hearing and the court ordered the officers to remove him.

At a November 2020 hearing, Sayidin was escorted into the courtroom for a hearing and immediately asserted, loudly that "I'll speak out for myself." Despite warnings from the court to keep his voice down, Sayidin continued to yell. Again, the court made a record of the events leading to Sayidin's removal:

> So Mr. Sayidin has been removed from court. I instructed the jail officers to remove him. I'm going to make a finding that Mr. Sayidin has voluntarily absented himself from this proceeding. . . . I've observed this a couple of times with Mr. Sayidin. He's actually—so he's walking in and I'm watching him. And he's actually quite quiet. He's not causing any problems. He's actually quiet all the way when he comes in. Then he's quiet just standing there. But as soon as I speak, counsel speaks, then he starts speaking in a very disruptive way. The record should reflect also, and it probably is going to be hard to hear, as I've done in the past with Mr. Sayidin, I've actually ordered him on a couple of occasions to keep his voice down so that we can get through the hearing. But, of course, he chose not to. I in fact gave him a last warning, and he chose not to stop talking.

At a December 16, 2020 hearing, Sergeant Maude asked that the court permit the escorting officers to keep Sayidin in restraints while he was in the courtroom. He based the request on the fact that Sayidin had by then committed 10 assaults against inmates and 4 assaults against jail staff while in custody and had a history of engaging in threatening behavior while in court. The court echoed Sergeant Maude's concerns and granted the request. Sayidin was brought in for the hearing in restraints and wearing a "spit sock" and a facemask, but he refused to keep the mask on, yelled expletives at the court, and told the court to "send [him] back" to his cell. The court ordered that Sayidin be removed from the courtroom, stating that Sayidin's refusal to wear his facemask during the COVID-19 public

health emergency posed a safety risk to everyone in the courtroom. After finding Sayidin competent, the court set the case for trial.

On April 19, 2021, the first day of trial, Sayidin again refused to come to court. The trial court entered a drag order to bring him into court. DAJD again requested that Sayidin be kept in restraints, this time for the duration of trial. Sergeant Maude explained that Sayidin was an "ultra-security inmate" and should either be brought in waist and leg restraints, or in a restraint chair, depending on his behavior. The court again granted the request, as well as DAJD's request that a restraint chair be used for that day's proceedings. When officers brought him into the courtroom, Sayidin protested that he was "being hijacked from [his] dungeon" and yelled nonsensical statements such as claims to be Jesus Christ. The trial court warned him that if he was not quiet, he would be removed. Sayidin stated he would not be quiet and did not want to be "nowhere." The court asked the officers to remove him.

After Sayidin left, the court had a discussion with the prosecutor, defense attorney, Sergeant Maude, and a DAJD lawyer regarding the most appropriate course of action for addressing Sayidin's "immense" track record of disruptive behavior while preserving his right to be present for his trial. The court, reviewing the factors laid out in *State v. Chapple*, 145 Wn.2d 310, 36 P.3d 1025 (2001), found that the court had repeatedly warned Sayidin that his conduct could lead to removal, that his conduct was severe enough to justify removal because "there is no way with Mr. Sayidin's behavior that we could have conducted court," and the court "had to shout at the top of my lungs to be heard above him."

In addressing the least restrictive alternative to prevent the defendant from disrupting the trial, the trial court considered a number of different ways in which Sayidin could participate or "tune in" to the proceedings via a remote location, but expressed concern about the security risks posed to those involved:

> [O]ne potential option is Mr. Sayidin is in a different courtroom where we can see him, he can see us. But that would probably—well, what it definitely would require is for jail officers to be present with him, which creates a security concern for all the reasons I previously stated.
>
> The other thing is I know, at least historically, I can think of at least one defendant during my time on the court, which has been 10 years, who was in a remote location. But what that also required is a second defense counsel actually to be in that remote location. And, one, I don't know if that's feasible for Ms. O'Connor's office; two, during this global pandemic, we're in a huge, huge backlog of very serious trials, and I don't know that there's defense counsel to . . . available to assist.
>
> And finally, to have defense counsel sit in in a remote courtroom location with Mr. Sayidin creates all sorts of security issues. I don't know if it's necessarily with Ms. O'Connor because I think Ms. O'Connor actually seems to have a decent rapport with Mr. Sayidin. But Mr. Sayidin has shown the proclivity to be extremely disrespectful and threatening to defense counsel. That's of concern as well.

The court also considered the possibility of setting up a remote location from which Sayidin could view the proceedings at the jail, but defense counsel stated it was her preference that the remote location be a room in the courthouse so that she may more easily communicate with Sayidin. Despite the court's security concerns, it agreed to set up a remote location at the courthouse and instructed defense counsel to meet with Sayidin to explain that he would be allowed to participate in the trial if he could behave according to the court's expectations and

that the remote location will be made available to him. The court then ended proceedings for the day.

The following day, April 20, 2021, Sergeant Maude informed the court that Sayidin had refused to leave his cell to go to the court. Defense counsel informed the court that she had asked jail officers to let Sayidin know that she needed to talk to him about his trial and the court's concerns. Sayidin had refused to meet with her to discuss these issues. Defense counsel also stated that she "would object to any kind of forcible transportation to court" as Sayidin had "made it clear he doesn't want to come to court today" and "it would be rather cruel to force him to come." The State argued that entering a use of force order to force Sayidin to come to court in a restraint chair to watch his trial from a remote courtroom was no longer the least restrictive alternative given his stated desire not to be present. Defense counsel indicated her preference was to check in with Sayidin daily to see if he changes his mind and wants to participate.

The court agreed and entered a finding that Sayidin knowingly and voluntarily waived his right to be present. It instructed defense counsel to attempt to speak to Sayidin again sometime in the following 24 hours to clarify that he does not wish to be present and wants to waive his presence. The court then commenced trial, addressing the parties' respective motions in limine and beginning jury selection.

On the morning of April 21, 2021, Sayidin again refused to come to court or to meet with defense counsel. The court found he had voluntarily waived his presence because he knew that the trial had started and that he can choose to

come or not come. The court, however, asked defense counsel to confirm that if Sayidin did change his mind and wanted to contact her, he had the means to do so. Defense counsel assured the court that Mr. Sayidin had her phone number as well as phone numbers for her paralegal and social worker. Sergeant Maude confirmed that if Mr. Sayidin wanted to reach his attorney or her office, he had the means to do so. The court asked the State if he needed to order defense counsel to go over to the jail every day. The prosecutor said "I think case law supports that and says we don't have to do this every morning and as long as the defendant has a way to contact defense counsel and let her in this case know of his wishes and his change in behavior, that that's sufficient." Based on this exchange, the court informed defense counsel that he was not going to order her to see Sayidin on a daily basis. Defense counsel did not object or raise concerns about this procedure. The parties completed jury selection in Sayidin's absence.

On the morning of April 22, 2021, defense counsel notified the court Sergeant Maude had informed her that Sayidin wanted to come to court. Although Sayidin was aware that trial had commenced, counsel asked the court for a few minutes alone with him to provide him with an update. The court stated that it would give Sayidin and defense counsel five minutes alone in the courtroom in order to talk and see what level of restraint would be necessary based on his behavior.

The record indicates this recess occurred at 8:49 a.m. The court entered the courtroom and went back on the record at 9:06 a.m., 17 minutes later.[2] When

---

[2] Sayidin contends on appeal that the trial court did not leave the bench or the courtroom for more than 20 seconds. *State v. Sayidin*, No. 83472-0 oral argument at 20:10, held on Jan. 13, 2023,

proceedings resumed, Sayidin was screaming at his attorney, calling her an "evil, evil, evil lady," and stated "I don't want to have anything to do with you. You're fired." As Sayidin continued to shout at his attorney, the court attempted to interrupt him and warned him that he needed to be quiet so that the court could address him. After three warnings that Sayidin was going to be excused from the courtroom, Sayidin responded, "I'm leaving it behind. I'm leaving it behind." Only at that stage did the court excuse Sayidin and ask the escort officers to remove him.

> The court then made a record of what had occurred, stating:
>
> I actually was in chambers when he initially arrived. And I kind of let things go on for maybe 20 seconds. He was screaming at the top of his lungs. Frankly, I should only have let it go on for two seconds because I was creating a security issue. I let it go on for say 20 seconds because I was hoping he would calm down. At least in one prior hearing, the Snohomish County hearing that I had previously referenced, at one point during the proceeding, he almost seemed to run out of steam, and so I thought maybe he would calm down. But it was clear he was not going to calm down, so I came out on the bench and instructed Mr. Henning to get the State in. Ms. Hinton was present for the State. Mr. Sayidin was screaming and shouting.

The court went on to explain that Sayidin's actions were volitional and posed a safety risk to others in the courtroom:

> If there is any kind of concern in the record about his competency, I'm not a psychologist, but I know a lot about Mr. Sayidin's cases and I've read the evaluations. He's been found competent. Mr. Sayidin's actions are so volitional and they are, they're so volitional, they're so dramatic, he is so goal-oriented on so many different levels because when I instruct Mr. Sayidin that he needs to be quiet so that I can address him, which of course I do need to address him pursuant to the case law we've already talked about, Chapple and Thompson and so forth, because I need to

https://tvw.org/video/division-1-court-of-appeals-2023011189/?eventID=2023011189. This characterization of events is not supported by the record. It is clear, from the bailiff instruction to attendees to "All rise," that the court had left the courtroom and was reentering at 9:06 a.m.

explain to him what the expectations of the court are so that he can reclaim his right to be here. When I instruct him to be quiet, he actually has the ability to stop, and then he'll say "What is it that you would like to talk to me about and address me about?" And then of course, he launches back in.

As far as from my perspective, I believe he understands what's going on and he frankly wants to kind of call the shots. He wants to do things the way he wants to do things, and that's just [not] how it works in a court of law. I gave him multiple warnings today. I warned him that if he didn't comply, he would be removed from court. He was standing in close proximity to Ms. O'Connor. He refused to keep his mask on. It frankly created a safety issue for all involved, specifically, Ms. O'Connor. And so he has been voluntarily absented from the proceeding.

Defense counsel did not object to the court's findings or its characterization of events.

On the final day of trial, April 26, 2021, the court inquired of defense counsel whether she had attempted to visit Sayidin at the jail since the previous hearing. Defense counsel stated she had not and the court instructed she do so over the noon hour. Both sides rested that morning. In the afternoon, Sayidin expressed a desire to come to trial and his attorney represented to the court that she had explained to him the court's expectations in order to reclaim his right to remain in the courtroom. But when he arrived, Sayidin once again, as he had done in earlier hearings, expressed a desire to "talk for myself," rather than through his counsel, and a desire to "represent myself," and fire his attorney. The court denied the motion for self-representation as untimely. The court then asked Sayidin if he would comply with the court's instructions and Sayidin responded that he would. The court therefore found that Sayidin had reclaimed his right to be present in the courtroom. When the jury was brought in, however, Sayidin addressed them

directly and ignored the trial court's instructions to be quiet. He was removed from the courtroom and the court made a record that Sayidin had been yelling and throwing papers and again found that he had voluntarily absented himself from the proceedings.

The jury found Sayidin guilty of first degree robbery. Before sentencing, the trial court entered findings of fact and conclusions of law that Sayidin had voluntarily absented himself from trial and had thus waived his right to be present at his trial. After finding Sayidin competent to be sentenced, the court imposed 171 months of incarceration.

## ANALYSIS

### Waiver of Right to be Present

Sayidin first argues that the trial court erred in finding that he voluntarily waived his right to be present at trial. Because the trial court applied the correct legal standard to find that Sayidin had affirmatively chosen not to attend or had, through intentional, disruptive and unsafe behavior, voluntarily absented himself from the courtroom, we reject this argument.

Criminal defendants have a constitutional right to be present at trial. *State v. Davis*, 195 Wn.2d 571, 578, 461 P.3d 1204 (2020); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. But that right is not absolute. *Chapple*, 145 Wn.2d at 318. A defendant's persistent, disruptive conduct can constitute a voluntary waiver of the right to be present in the courtroom. *State v. DeWeese*, 117 Wn.2d 369, 381, 816 P.2d 1 (1991); *Illinois v. Allen*, 397 U.S. 337, 343, 90. S. Ct. 1057, 25 L. Ed. 2d 353 (1970). A trial court's determination of whether a defendant voluntarily

- 13 -

waived the right to be present depends on the totality of the circumstances and is reviewed for abuse of discretion. *Davis*, 195 Wn.2d at 580-81.

When dealing with a disruptive defendant, trial judges have great discretion in electing the method for maintaining the appropriate courtroom atmosphere best suited to the circumstances. *Chapple*, 145 Wn.2d at 319.

> While courts indulge in reasonable presumptions against the loss of constitutional rights, trial judges who are confronted with disruptive, "contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. *No one formula* for maintaining the appropriate courtroom atmosphere will be best in all situations."

*Davis*, 195 Wn.2d at 579 (quoting *Allen*, 397 U.S. at 343). Our Supreme Court has identified basic guidelines to assist trial courts in dealing with a disruptive defendant. *Chapple*, 145 Wn.2d at 320. First, the trial court must warn the defendant that his conduct may lead to removal. *Id*. Second, the defendant's conduct must be severe enough to justify removal. *Id*. Third, the trial court should employ the least severe alternative that will prevent the defendant from disrupting the trial. *Id*. Fourth, the defendant must be allowed to reclaim his right to be present upon assurances that his or her conduct will improve. *Id*. These guidelines are intended to ensure that trial courts exercise their discretion in a manner that affords defendants a fair trial while maintaining the safety and decorum of the proceedings. *Id*.

*Davis* is analogous to this case. In that case, the trial court removed the defendant—who was representing himself—from the courtroom during trial after making repeated outbursts and disrupting the proceedings. *Davis*, 195 Wn.2d at 575-77. After being warned that he would be removed if he continued to raise his

voice and curse, Davis stated "You can hold your trial without me," and "Just go ahead with your kangaroo court. . . . I'm done with it." *Id.* at 576. The trial court found that Davis had voluntarily absented himself from the proceedings. *Id*.

Like Sayidin, Davis argued on appeal that the trial court had an insufficient basis on which to conclude that his absence was voluntary. *Id*. at 581. Our Supreme Court disagreed, concluding that the record established that his removal was purely voluntary. *Id*. at 582. Davis stated multiple times that he did not plan to be at court and wanted to leave, saying things such as "You can remove me now," "You can hold your trial without me," and "I'm not going to be here." *Id*. The court concluded that Davis's "[d]isorderly behavior and consistent requests to leave the courtroom demonstrate that Davis waived his right to be present." *Id.* at 583.

As in *Davis,* the record here clearly demonstrates that for over four years, Sayidin did not want to leave his jail cell to attend hearings, even when forced to do so, and that he engaged in a pattern of disruptive outbursts every time he set foot in the courtroom for pretrial hearings and at trial. The record documents that Sayidin screamed profanities at such a volume that the court could not hear counsel. On each occasion, the court gave Sayidin oral warnings that his failure to be quiet would result in his removal and could result in him having to observe his trial remotely.

On multiple occasions, Sayidin made statements indicating his desire not to be involved in the court proceedings, such as "I don't want to stay here no more," and "send me back." Sayidin's conduct indicating voluntary absence went even

further than that at issue in *Davis* because of Sayidin's repeated refusal to be transported to the courthouse. Just as in *Davis*, the record indicates that Sayidin expressed his desire not to be present for trial on April 19, 20, and 21, 2021. On each of those days, Sayidin refused to voluntarily come to court. The trial court thus clearly did not abuse its discretion in concluding that Sayidin had voluntarily absented himself from the proceedings on the days in which he requested to leave court or refused to appear.

Sayidin contends that the trial court did not strictly adhere to the *Chapple* guidelines by failing to ensure that Sayidin understood that his trial had begun and by failing to offer video conferencing to Sayidin to allow him to participate remotely. These arguments are not supported by case law or this record.

First, the Supreme Court in *Chapple* made clear that the factors it set out are not mandatory but are instead basic guiding principles. 145 Wn.2d at 320. That the trial court did not strictly adhere to each of the four guidelines at every pretrial hearing or on every day of trial does not mean that Sayidin's constitutional rights were violated.

Second, Sayidin was aware his trial had begun. On April 19, defense counsel stated "I did meet with Mr. Sayidin on Friday when it was clear we were starting trial this morning, and I explained this to him. I told him that we would be starting trial. I asked him to please come to court and be reasonable in his behavior." Defense counsel again represented to the court on April 22, 2021, before the parties presented opening statements, that "I think he does know that trial has commenced." And on the afternoon of April 26, the court addressed

Sayidin about remaining quiet during the parties' closing arguments and he was present in the courtroom when the jury entered. This record supports the conclusion that Sayidin was in fact aware that his trial was proceeding in his absence.

Third, the trial court in fact made remote viewing of the trial available to Sayidin on April 19 before trial began. On April 20, the court noted that the State had encouraged the court to provide a remote location for Sayidin and that the court had accommodated that request. But it determined that Sayidin had refused to come to court or to go to the remote location that the court had set up. It subsequently determined that forcing Sayidin to watch the trial in a remote location would not be the least restrictive means of ensuring he did not disrupt trial because Sayidin had clearly indicated he did not want to come to court. Thus, the trial court did in fact offer Sayidin the option of attending his trial remotely; Sayidin simply chose not to exercise the right to participate in this way.

Sayidin next argues that his disruptive behavior reflected his poor mental health and lack of capacity to assist defense counsel and therefore cannot be found to be a voluntary waiver. But the trial court ordered Sayidin to undergo competency evaluations no fewer than seven times before trial commenced. The court ultimately found Sayidin competent both before trial and at sentencing. Mid-trial, the court described its observations regarding the willfulness of Sayidin's behavior, finding his actions to be "volitional" and "goal-oriented," and concluding that Sayidin "understands what's going on and . . . wants to . . . call the shots." On

April 26, Sayidin himself demonstrated his ability to control his conduct, to listen to the court, and to answer the court's questions appropriately.

The court's findings that Sayidin voluntarily absented himself from trial are supported by the record.

Waiver of Right to Testify

Sayidin separately contends that he did not voluntarily or knowingly waive the right to testify at trial because the trial court did not explicitly warn him, on the record, that his removal from the courtroom would preclude him from testifying. But we do not require trial courts to advise defendants of their right to testify and Sayidin's disruptive conduct was sufficiently severe to constitute a knowing and voluntary waiver of the right to testify.

Criminal defendants have a federal constitutional right to testify in their own defense under the Fourteenth Amendment's right to due process of law, the compulsory process clause of the Sixth Amendment, and the corollary to the Fifth Amendment's guarantee against compelled testimony. *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). Our state constitution explicitly provides that "[i]n criminal prosecutions the accused shall have the right . . . to testify in his own behalf." WASH. CONST. art. I, § 22. Any waiver of this right must be made knowingly, voluntarily, and intelligently. *State v. Thomas*, 128 Wn.2d 553, 558, 910 P.2d 475 (1996).

Sayidin argues that without an on-the-record colloquy between Sayidin and the court in which it addressed his right to testify, there was no basis for concluding that he knowingly, intelligently, and voluntarily waived that right. We disagree.

- 18 -

The U.S. Constitution does not impose any obligation on trial courts to inform a defendant of their right to testify before a defendant may validly waive that right. *Thomas*, 128 Wn.2d at 558-59. Our Supreme Court has identified several policy reasons for not mandating a judicial inquiry into a defendant's decision to take the stand:

> [I]t seems ill-advised to have judges intrude into the attorney-client relationship or disrupt trial strategy with a poorly timed interjection. The Ninth Circuit recognized that "it is hard to say when the judge should appropriately advise the defendant—the judge does not know the defendant is not testifying until the defense rests, not an opportune moment to conduct a colloquy." As a result, courts rely upon defense counsel to inform the defendant of his constitutional right to testify.

128 Wn.2d at 560 (citations omitted; quoting *United States v. Martinez*, 883 F.2d 750 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir.), cert. denied, 501 U.S. 1249 (1991)).

Sayidin, however, argues that the Washington Constitution is more protective with regard to the right to testify. He contends our state constitution should require courts to inquire whether a defendant understands they have the right to testify before it deems that right waived. The petitioner in *Thomas* made the same argument. 128 Wn.2d at 561-62. But the Supreme Court concluded that his *Gunwall*[3] analysis was inadequate to support the argument and that "Thomas failed to provide sufficient support for his bare assertion that the Washington Constitution should be interpreted as more protective of a defendant's right to testify than the federal constitution." *Id.* at 562.

---

[3] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

This court addressed the same issue in *State v. Russ*, 93 Wn. App. 241, 969 P.2d 106 (1998). In *Russ*, this court assumed that the state constitution does in fact afford greater protection of the right to testify than does the federal constitution. *Id.* at 245. We nevertheless held that the concerns underlying the holding in *Thomas* were equally applicable to the state constitutional right as to the federal one. *Id.* at 246. The court explained:

> First, under our state constitution, as under the federal constitution, the right to testify is in tension with the right *not* to testify. For that reason, it will generally be inappropriate for a judge to influence a defendant's choice between these two rights. A colloquy that focuses on the right to testify may unduly influence a defendant's exercise of the right not to do so. Second, the timing of such a colloquy is problematic. Third, there could be tactical reasons, unknown to the judge, that would make it inappropriate for the judge to insert herself into the relationship between client and counsel. Finally, while there may be situations where a defendant's failure to take the stand could not represent an effective waiver, we believe such situations are likely to be extremely rare.

*Id.* at 246-47. Accordingly, this court held "there is no general obligation of a court to inform a defendant of the right to testify in one's behalf or to conduct a colloquy to ensure a knowing, voluntary, and intelligent waiver of that right." *Id.* at 247.

The following year, in *State v. Robinson*, 138 Wn.2d 753, 759, 982 P.2d 590 (1999), a defendant alleged that his attorney prevented him from testifying and contended he was entitled to an evidentiary hearing on the factual issue. Although Robinson did not argue that the state constitution is more protective than the federal constitution in the context of the right to testify, the court cited with approval to *Thomas* and *Russ,* stating that under both the state and federal constitutions, "the trial court need not obtain an on the record waiver by the defendant." *Id.*

Most recently, this court again addressed the issue in *State v. Lee*, 12 Wn. App. 2d 378, 460 P.3d 701 (2020). *Lee* reiterated the same concerns expressed in *Thomas* and *Russ* and acknowledged the holding in *Robinson* "that the right to testify may be waived through a defendant's conduct." *Id.* at 390-92. The court declined to address Lee's *Gunwall* analysis because it

> analyzes each of the six criteria set forth in *Gunwall*, [but] it does so only in the context of determining whether the right to testify under the Washington Constitution requires independent interpretation from the right to testify under the United States Constitution . . . . That is only half the required analysis. Absent from Lee's *Gunwall* analysis is any explanation as to why, if we agreed that independent interpretation is warranted, we must conclude that a colloquy is required.

*Id.* at 391, n.4.

*Thomas* and its progeny control here. While Sayidin has conducted a *Gunwall* analysis, like the defendants in *Lee* and *Thomas*, the analysis is superficial and does not specifically explain why the court should require, as a constitutional mandate, a colloquy between the trial court and the defendant before the court can find a waiver of the right to testify. Even assuming, as the Supreme Court did in *Russ*, that article I, section 22 of the state constitution provides greater protections than its federal counterpart, Sayidin has failed to explain why a colloquy is necessary to ensure a knowing, voluntary, and intelligent waiver of the right to testify.

Sayidin next argues that the record is insufficient to support the trial court's finding that he knowingly and voluntarily waived his right to testify. Under *Chapple*, a defendant may waive the right to testify through disruptive conduct when their conduct becomes "so inconsistent with the necessary decorum for effective

administration of justice that reasonable restraints are necessary." 145 Wn.2d at 327 (quoting *United States v. Ives*, 504 F.2d 935, 941 (9th Cir. 1974)). The trial judge has great discretion to determine whether a defendant has waived the right to testify by their conduct. *Chapple*, 145 Wn.2d at 327. In exercising this discretion, "a trial judge must be careful to properly balance the constitutional rights of the defendant against the necessary decorum of the courtroom," considering the gravity of past disruptions, the probability of continued disruption, and the possibility of violence if the defendant takes the stand. *Id.* The Supreme Court held that Chapple had waived his right to testify because he "was gravely disruptive, he refused to conform with a question and answer format if allowed to testify, and his guards believed that violent behavior on the stand was a distinct possibility, especially if [he] became agitated." *Id.* at 328. We reach the same conclusion here.

As in *Chapple*, the trial court here explained the gravity of Sayidin's past disruptions in the courtroom. It anticipated that his disruptive behavior would continue, and in fact, it did continue every time Sayidin entered the courtroom. The court also made it clear that because Sayidin was yelling so loudly, it would be impossible to conduct trial with him present. And the court laid out the concerns the jail officers had about the risk of violence, given Sayidin's history of assaulting staff and the need for ankle, wrist and belly chain restraints. The court shared these concerns for counsel and court staff. Sayidin's behavior was so disruptive as to require his removal from the courtroom and it was similarly sufficiently disruptive to constitute a waiver of the right to testify in that courtroom.

We acknowledge that, unlike in *Chapple*, the trial court did not ask defense counsel whether Sayidin intended to testify. But the record clearly indicates that defense counsel was aware of the issue as she proposed the standard pattern instruction, providing "[t]he defendant is not required to testify. You may not use the fact that the defendant has not testified to infer guilt or to prejudice him in any way." The court gave this requested instruction. We have no basis for concluding that counsel failed to discuss this issue with Sayidin at some point during her representation of him and it appears she developed a trial strategy that did not involve Sayidin taking the stand.

Sayidin relies on a statement he made to the court on the afternoon of April 26, to the effect that he wanted to "talk for [himself]," as a reflection of his wish to testify. But this comment is taken out of context. Before Sayidin entered the courtroom that afternoon, defense counsel confirmed she had met with her client, that he had asked to come to court, and she had notified him of the court's expectations for him to reclaim his ability to be in court. When the court asked what Sayidin's response was, counsel stated "In a nutshell, Your Honor, he wants to speak for himself. He doesn't recognize me as his attorney. I am part of the government." When the court indicated that "that is just not going to work," counsel explained:

> And your honor, I did tell him that while he has the right to talk to the court, he has to also listen to what the court has to say and to allow the court to explain some things to him, and that everybody gets a turn to talk in court and he has to respect everyone's turn to talk.

The court then asked that Sayidin be brought into the courtroom. The exchange between the court and Sayidin went as follows:

Mr. Sayidin: I'm not sitting there. I'm going to be sitting by myself.

Court: Okay. So just for the record, ---

Mr. Sayidin: I'm going to be sitting by myself.

Court: -- we're back on the record with Mr. Sayidin.

Mr. Sayidin: I got to talk for myself, sir, because I have a [indiscernible] right here.

Court: Mr. Sayidin, I'm actually talking right now.

Mr. Sayidin: I want to talk for myself.

Court: Okay. So I'm going to talk first, --

Mr. Sayidin: Okay.

Court: -- and then if you're behaving appropriately, I'll let you address me, okay?

Mr. Sayidin: I'm not going to sit there. I'm sitting, I'm standing right here.

Court: So first of all, Mr. Sayidin, I just want to make myself clear. A couple of things. One, you need to make sure you be quiet when I ask you to be quiet. Two, you need to make sure you keep your mask on properly. Three, when I speak to you, you need to not be talking and you need to listen. Four, you need to make sure you don't create any type of disruptions; yelling, screaming, cursing, any of that is not acceptable. Do you understand all those things, sir?

Mr. Sayidin: I have slow understanding because of my head injury.[4]

Court: Do you understand all those things, sir?

Mr. Sayidin: Not really.

Court: Okay. So Mr. Sayidin, you need to comply with all those things if you're even going to be allowed to stay in court. Are you

---

[4] In several hearings and at trial, Sayidin repeatedly asserted that he had a brain injury documented in his medical records. This assertion, however, was disputed by the State and the Harborview medical records summarized in Sayidin's competency evaluation revealed no diagnosis of any traumatic brain injury. Sayidin did not assert a diminished capacity defense at trial.

- 24 -

saying that you cannot understand those instructions or will not comply?

Mr. Sayidin: I didn't say I didn't comply. I have a hard time understanding because of my brain injury, so.

Court: Mr. Sayidin, I've actually read multiple evaluations about you, sir, and four very simple instructions I just gave you, I really believe that you can understand those. Now, whether you choose to say you understand, that's a different issue. But I've given you some very clear directives. Do you understand and will you comply with those?

Mr. Sayidin: All I'm going to say is this: I want to speak out for myself. I don't trust nobody. So I'm here to represent myself. I have my medical record.

Court: Yeah. I'm not going to allow you to do that, Mr. Sayidin, because you are represented by counsel. Any attempts by you to discharge counsel or try to act as your own attorney is untimely. Should have been brought in a different way and much sooner, so I'm not going to let you speak for yourself.

Mr. Sayidin: Well, I don't know what to tell you, but that's, that's—all I'm trying to say is the government is corrupted, so therefore, the [indiscernible] is corrupted. I do not trust them, so therefore, I'm here to represent myself point blank.

The court treated his comments as a motion to waive counsel and to represent himself, a motion it denied. The court then asked Sayidin if there were any other concerns he wanted to discuss, at which time Sayidin merely reiterated his request to represent himself because he did not trust his appointed counsel.

When Sayidin's statements that he wanted to "speak for himself" are read in this context, it is quite evident he was not asserting a right to testify but was instead asserting a right of self-representation.

But even if we considered Sayidin's statement to be an unequivocal expression of his intent to testify, his subsequent actions were sufficient to constitute a waiver of this right. The moment the jury was brought into the

courtroom on the afternoon of April 26, Sayidin immediately began to address them directly, ignored the court's instructions not to do so, and was removed from the courtroom. The court asked the jury to leave once again and made the following record of what had occurred:

> Just for the record, I just want to recount what happened to the extent that the record is not clear. I clearly explained the court's expectations to Mr. Sayidin. Mr. Sayidin clearly stated that he would comply with the court's orders. Of course, I had my concerns that he would not, but I gave him the benefit of the doubt.
>
> As soon as the jury came in and I was about to have them sit, Mr. Sayidin, who previously was seated, stood up, began to talk very loudly, started throwing his papers. At that point, I asked Sergeant Maude to remove Mr. Sayidin from court. I would say the exposure in front of the jury was maybe all told 15 to 20 seconds. After the officers removed Mr. Sayidin, he was taken into the hall and then escorted towards the jail.
> . . . .
> I am going to again make a finding that Mr. Sayidin has voluntarily absented himself. At the very first opportunity to not comply with the court's orders and specifically in front of the jury, Mr. Sayidin took the opportunity to act out. Frankly, it's an affront to the administration of justice, and so I am again making a finding of voluntary absence. And so Mr. Sayidin is, no matter, even if at this point he said he wanted to be here, he is absented from the proceedings so that we can get closing argument done.

The trial court did not abuse its discretion under *Chapple* in preventing Sayidin from taking the stand. The record clearly demonstrates that the trial court appropriately balanced Sayidin's constitutional rights against the courtroom decorum necessary for the administration of justice, safety concerns for those in the courtroom, and concerns regarding prejudice to Sayidin himself should he be allowed to behave disruptively in front of the jury. The record more than supports the trial court's findings that Sayidin gravely and intentionally disrupted court proceedings and posed a safety risk to those in the courtroom. The record also

establishes that Sayidin clearly understood the trial court's expectations regarding his behavior and was able to behave accordingly when not in the presence of the jury. The court additionally afforded Sayidin multiple warnings before his removal. The record thus establishes that Sayidin knowingly, intelligently, and voluntarily waived the right to testify.

Affirmed.

Andrus, C.J.

WE CONCUR:

Birk, J.

Smith, A.C.J.